IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SUSAN SKRZECZ,                          *

    Plaintiff,                          *

      v.                               *           Civil Action No. RDB-13-1796

GIBSON ISLAND CORPORATION, et al.,   *

    Defendants.                         *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

The Plaintiff Susan Skrzecz has brought this action against the Defendants Gibson Island Corporation, Richard McMillan, Jr., and Richard Dorio, alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 203, *et seq.*, the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. § 3-401, *et seq.*, and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* Presently pending is the Defendants' Motion for Summary Judgment (ECF No. 24). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, the Defendants' Motion (ECF No. 24) will be GRANTED IN PART and DENIED IN PART, specifically it is granted as to the Plaintiff's claims for unpaid wages, but denied with respect to the retaliation claim.

## BACKGROUND

On a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Gibson Island is a private, gated residential community in Anne Arundel

County, Maryland.   The Plaintiff is a police officer and emergency medical technician ("EMT") for the Gibson Island Police Department, and is employed by the Defendant Gibson Island Corporation (the "Corporation").   Defendant Richard McMillan, Jr. is the former President of the Corporation and Defendant Richard Dorio is its General Manager.[1] The Plaintiff started working for the Corporation in approximately May of 2010.   Affidavit of Plaintiff Susan Skrzecz ¶ 2, ECF No. 29-1.   She was interviewed and hired by Sergeant Tim Welsh, another police officer/emergency medical technician who worked for the Corporation.   *Id.* ¶ 3; Am. Compl. ¶ 20, ECF No. 35-2.[2]   She was paid hourly.   Am. Compl. ¶ 20.   Her duties included manning the gatehouse that guards Gibson Island, patrolling the Island, and responding to medical, police, and fire emergencies.   Pl.'s Aff. ¶ 29-30.   In addition, so that police and medical services were available twenty-four hours per day, one officer was required to be "on call" at night after the regular shifts ended.   Am. Compl. ¶ 20. When she began her employment, Skrzecz did not work on-call time, except for a few occasions when she covered for Sergeant Welsh.   Pl.'s Aff. ¶¶ 2-3.   She does not recall whether she was paid for working on-call time on those occasions.   *Id.* ¶ 3.

In April of 2011, the Corporation offered Skrzecz free housing on Gibson Island so that she could be available to immediately respond to emergencies.   Am. Compl. ¶ 20.   She accepted and moved into a cottage on the Island.   Sergeant Welsh lived in the cottage next door.   *Id.* ¶ 31.   Although her employment was at-will, she signed a lease whereby she would

---

[1] Defendant McMillan's term ended on December 31, 2013, and his successor as President of the Corporation is not a party to this case.
[2] The Plaintiff was permitted to amend her Complaint to add three additional claims sounding in fraud.   However, by agreement of the parties, this Court entered an Order (ECF No. 34) allowing the pending Motion for Summary Judgment (ECF No. 24) to proceed as a partial motion for summary judgment.   Accordingly, this Court addresses only Counts I, II, III & IV.

only be permitted to live in the cottage while she was still employed by the Corporation. Am. Compl. ¶ 22. The Plaintiff was also aware that, under this arrangement, she would be required every other month to be on-call from 2 a.m. to 6 a.m. *Id.* ¶ 21. After she moved into the cottage, the Plaintiff learned for the first time that she would have to work on-call time much more often than she was originally told. Pl.'s Aff. ¶ 4. Although Sergeant Welsh told her that she would be paid extra in her check each month for on-call time, he instructed Skrzecz not to discuss the matter of payment with anyone else. *Id.* The Chief of the Police Department, Chris Sperry, informed her that she would be on-call on all holidays and that she was required to keep a pager on her at all times, including taking it into the bathroom with her when she showered. Am. Compl. ¶ 27-28. When she first moved onto the Island, Skrzecz was place on call for two straight months. *Id.* ¶ 29.

Despite Sergeant Welsh's representations, Skrzecz was not paid for on-call time. Pl.'s Aff. ¶ 5. In approximately May of 2011, the Plaintiff asked Chief Sperry about pay for on-call hours. He told her to "shut [her] mouth," and that she should never raise the topic again or she would lose her job and the house. Am. Compl. ¶ 25. Chief Sperry also informed the Plaintiff for the first time that being allowed to live in the cottage was considered compensation. Pl.'s Aff. ¶ 5. The Plaintiff asked if she could move out of the cottage, but Chief Sperry said that moving would result in termination. *Id.* ¶ 6. She also alleges that several other employees of the Corporation, such as the Harbor Master Assistant and Golf Course Supervisor, receive free housing as part of their benefit package but are not required to be on-call. *Id.* ¶ 11. Skrzecz again raised the issue with Chief Sperry in June 2011. *Id.* ¶ 7. He became extremely angry that she had brought up the topic of on-call time

and told her that if she talked about it again, she would lose her job.  *Id.*  Skrzecz did not mention on-call pay to Chief Sperry again and did not complain to Defendants McMillan or Dorio.  *Id.* ¶ 8.

The Plaintiff's schedule typically required her to work an eight-hour shift during the day and then be on call from midnight until 7 a.m.  *Id.* ¶ 9.  While she was on call, she could eat, watch television, or sleep.  Deposition of Susan Skrzecz 84-85, ECF No. 24-3.  She could not, however, leave the Island, could not drink alcohol, and was restricted in having guests at her house.  *Id.*  The Plaintiff stated that her son comes over when she is on call, but that she cannot have her boyfriend or her grandchildren over because she might have to leave them alone if called out.  *Id.*; Pl.'s Aff. ¶ 34.  She had to be ready to respond to any emergencies that came over the Anne Arundel County Fire pager radio at a moment's notice.  *Id.* ¶ 35.  The radio received calls that pertained not only to Gibson Island, but also the surrounding area.  *Id.*  She estimates that there may be several radio calls per night, disrupting her sleep.  *Id.* ¶ 38.  However, the Plaintiff states that "not a great many resulted in call outs."  Pl.'s Opp. 17, ECF No. 29.  In 2011, the Plaintiff responded to six calls in 188 nights on call; in 2012, four calls in 163 nights; and five calls in all of 2013.  *See* Pl.'s Answers to Interrogatories 5, Defs.' Opp. Ex. 2, ECF No. 24-2.  The Plaintiff also alleges that Chief Sperry changed her on-call schedule with little or no notice.  Am. Compl. ¶ 26.  Even on her days off, she was scheduled to be on call and had to keep her radio pager on her at all times.  Pl.'s Aff. ¶ 10.  She estimates that in 2011, she often worked 180 or more hours per month.  *Id.* ¶ 12.  Skrzecz states that she felt like she was in prison on the Island.  *Id.* ¶ 38.

The Plaintiff has also experienced financial difficulty.  She filed a Chapter 7 bankruptcy petition on April 20, 2012.[3]  Pl.'s Aff. ¶ 14.  A different attorney handled her bankruptcy case than her current counsel.  In listing her assets as part of the bankruptcy proceeding, her former attorney did not ask her whether she thought she was owed unpaid wages or whether she thought she had any legal claims against the Defendants. *Id.*  The United States Bankruptcy Court for the District of Maryland entered a Final Decree and Order of Discharge on July 25, 2012.

Some months after Skrzecz moved onto the Island, she alleges that Sergeant Welsh, her next-door neighbor, began to sexually harass her.[4]  Am. Compl. ¶ 30.  She alleges that Welsh inappropriately touched her chest on two occasions, lurked outside the windows of her house, hid inside her house, and called her various vulgar names. *Id.* ¶ 30-33.  She complained to Chief Sperry and to Defendants McMillan and Dorio but the situation was not resolved. *Id.*  In May of 2012, the Plaintiff requested to Chief Sperry that she be allowed to move off of the Island so that she would not have to live next door to Welsh. *Id.*  Perry responded that she would not be allowed to move off of Gibson Island or to trade houses with another employee. *Id.*  He added that if she did not want to live on the Island, she could not work there and she would need to seek another job. *Id.*  By October of 2012, Sergeant Welsh's conduct had not stopped, and the Plaintiff sought legal advice. *Id.* ¶ 33.

---

[3] According to the Plaintiff, she has filed for bankruptcy twice.  Pl.'s Opp. 17.  Only the April 2012 petition is at issue with regard to this Motion.

[4] It is unclear from the Plaintiff's allegations exactly when she alleges that the harassment began.  In her Amended Complaint, she alleges that she first complained of harassment by Sergeant Welsh in "early Fall 2012," but then goes on to allege that she requested to move off the Island to get away from Welsh in May 2012.  Therefore, taking the facts and inferences therefrom in the light most favorable to the Plaintiff, it appears that her allegation is that the allegedly harassing behavior began in Fall 2011.  However, this distinction is not material to the issues raised on summary judgment.

Plaintiff's counsel sent a letter to Defendant McMillan that advised of the alleged sexual harassment. *Id.* As a result, McMillan and Dorio interviewed the Plaintiff, investigated her allegations, and determined them to be credible. Am. Compl. ¶ 34-35. As a result of their findings, McMillan and Dorio fired Sergeant Welsh. *Id.*

In the same timeframe, Plaintiff's counsel also raised the issue of pay for on-call time with Defendants McMillan and Dorio. The Defendants maintained that she would not be paid any additional wages for any on-call time because she was provided with free housing. Am. Compl. ¶ 36. Thereafter, on June 19, 2013, Skrzecz filed the subject four-count Complaint in this Court, asserting claims for (1) violations of the Fair Labor Standards Act, 29 U.S.C. § 203, *et seq.*, (2) violations of the Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. § 3-401, *et seq.*, (3) violations of the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501, *et seq.*, and (4) retaliation for exercising rights pursuant to the Fair Labor Standards Act.

Skrzecz alleges that since December of 2012, the Defendants have attempted to make her working conditions intolerable so that she will quit. Am. Compl. ¶ 37. After Sergeant Welsh was terminated, she had to take all the on-call time because she was the lone police officer/EMT. Pl.'s Aff. ¶ 29. The Plaintiff also alleges that, since her attorney contacted the Corporation, Chief Sperry made such schedule changes in retaliation for her complaining about on-call time pay. For example, Skrzecz was scheduled to work on Christmas when he knew that she planned to host an open house. Am. Compl. ¶ 38. Since she obtained representation, Chief Sperry has told the Plaintiff to tell her lawyer to "back off" because "people are angry," and that "all of these problems are because you've raised the issue about

your pay." *Id.* ¶¶ 40-42.  Skrzecz also alleges that Sperry was angry that Sergeant Welsh was

fired amid her allegations.  Pl.'s Aff. ¶ 26.  The Plaintiff also alleges that Chief Sperry actively

sought a reason to terminate her.  On May 31, 2013, he released a "Chief's Memorandum"

that the Plaintiff alleges changed the on-call rules to suit the Defendants' theory of this case.

Pl.'s Opp. Ex. 5, ECF No. 29-5.  Then, in December of 2013, she was disciplined for a

violation of the new rules.  *Id.*  Once, she saw Chief Sperry sitting in his car outside her

house at 6 a.m.  He said that he was watching her to see if she was doing anything wrong.

Am. Compl. ¶ 44.  Chief Sperry also followed the Plaintiff off the Island when she went to

the bank on Corporation business, even though he was required to stay on the Island to

cover her position.  *Id.*  It is alleged that the Defendant McMillan demanded a retraction of

the allegations against Chief Sperry, and attempted to meet with Skrzecz regarding those

allegations, as well as the wage dispute even though she was represented by counsel.  *Id.* ¶

45-46.  The Corporation's position was that McMillan had the right to hold a "work

meeting" with her.  *Id.*

Skrzecz continues to be employed by the Corporation and lives on Gibson Island,

under the same working conditions.  She alleges that she suffers from chronic anxiety,

depression, and post-traumatic stress disorder for which she receives counseling on a weekly

basis.

Following a period of discovery, the Defendants moved for summary judgment.

Thereafter, this Court granted the Plaintiff leave to file an Amended Complaint (ECF No.

14-1), which added several fraud-based claims.  The facts and legal issues surrounding the

additional claims have not briefed for summary judgment.  Accordingly, this Court allowed

the Defendants' pending Motion for Summary Judgment to proceed on a partial basis, considering only the four wage-based claims in the original Complaint.

<u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). However, there must be a "*genuine*" dispute as to those facts. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-48 (emphasis in original))). This Court must abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).   This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

DISCUSSION

The Defendants move for summary judgment on the four wage-based claims as a matter of law.   They first argue that the Plaintiff is judicially estopped from asserting her claims because she failed to list them as assets in her bankruptcy petition.   Second, the Defendants argue that even if she is not judicially estopped from bringing her wage-based claims, McMillan and Dorio are entitled to summary judgment on all claims because they are not "employers" under state or federal law, and that all four of her claims fail on substantive grounds.

**I.      Judicial Estoppel**

On April 20, 2012, Skrzecz filed a petition pursuant to Chapter 7 of the Bankruptcy Code, 11. U.S.C. § 701, *et seq.*,[5] and a no-asset discharge was entered on July 25, 2012.   The Defendants argue that because the Plaintiff did not disclose these subject claims in her 2012 bankruptcy petition, she is barred from asserting the claims now by the doctrine of judicial estoppel.   Judicial estoppel is "an equitable doctrine that exists to prevent litigants from

---

[5] According to the Plaintiff, she had previously declared bankruptcy.   As noted above, that earlier bankruptcy proceeding is irrelevant to the issue of judicial estoppel in this case.

playing 'fast and loose' with the courts—to deter improper manipulation of the judiciary."[6]

*Folio v. City of Clarksburg, W. Va.*, 134 F.3d 1211, 1217 (4th Cir. 1998) (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28-29 (4th Cir. 1995)).  As this Court has previously noted,

> In order for judicial estoppel to apply, (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party must have acted intentionally, not inadvertently.

*Calafiore v. Werner Enters., Inc.*, 418 F. Supp. 2d 795, 797 (D. Md. 2006) (holding that debtor was judicially estopped from seeking certain damages stemming from claim intentionally not disclosed in bankruptcy petition) (quoting *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 292 (4th Cir. 1998)).  The United States Court of Appeals for the Fourth Circuit has also recognized, in line with the other Courts of Appeals to consider the question,  that "[j]udicial estoppel has often been applied to bar a civil lawsuit brought by a plaintiff who concealed the existence of the legal claim from creditors by omitting the lawsuit from his bankruptcy petition."  *See Whitten v. Fred's, Inc.*, 601 F.3d 231, 241-42 (4th Cir. 2010) (holding that plaintiff was not barred from bringing suit where she disclosed potential claims), *abrogated in part on other grounds by Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434, 2443 (2013)

---

[6] Likewise, under Maryland law, judicial estoppel "looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." *WinMark, L.P. v. Miles & Stockbridge*, 693 A.2d 824, 828 (Md. 1997) (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988) (holding that debtor's "failure to list its claim against the bank worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect.")).

(rejecting the "nebulous" definition of a supervisor for purposes of determining employers' vicarious liability).

In a petition for personal bankruptcy, a debtor is required to list a "schedule of assets," including "all personal property of the debtor of whatever kind," and property of a bankruptcy estate is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §§ 521(1), 541(a)(1). As noted by this Court, this definition includes "all causes of action that could be brought by a debtor," and the duty to disclose such claims continues for the duration of the bankruptcy proceeding. *Calafiore*, 418 F. Supp. 2d at 797 (quoting *USinternetworking, Inc. v. Gen. Growth Mgmt., Inc. (In re USinterntetworking)*, 310 B.R. 274, 281 (Bankr. D. Md. 2004)).

The first three elements of the test for judicial estoppel noted by this Court in *Calafiore v. Werner Enterprises, Inc.* may arguably have been satisfied in this case. 418 F. Supp. 2d at 797. While the Plaintiff certainly knew of the factual basis for her wage-based claims during her bankruptcy proceeding, she did not list a potential claim as an asset. Ultimately, the Bankruptcy Court discharged her debts in July of 2012. This Court need not make a factual finding with respect to any inconsistency, in light of the fact that the fourth element of judicial estoppel, specifically intent, is not satisfied in this case.

In the *Calafiore* case, this Court noted that the fourth element of intent is often "determinative" in the application of judicial estoppel. *Id.* at 798. Intent in this context means that a plaintiff "intentionally misled the court to gain unfair advantage." *Id.* ("[J]udicial estoppel should only apply where the plaintiff acted intentionally in taking inconsistent positions, and 'will not be applied where the party's inconsistent positions

11

resulted from inadvertence or mistake." (quoting *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196-97 (4th Cir. 1998))).  Indeed, the Fourth Circuit has analyzed the issue of intent in terms of whether there is evidence of bad faith. *Whitten v. Fred's, Inc.*, 601 F.3d at 242.

In bankruptcy cases where there is no direct evidence of intent, intent may be inferred in some circumstances.  Deliberate or intentional misconduct can be inferred from a debtor's failure to satisfy the statutory duty to disclose a potential cause of action if the debtor "has knowledge of the undisclosed claims and a motive for concealment." *Calafiore*, 418 F. Supp. 2d at 798 (citing cases).  "If [an] undisclosed claim would have added assets to the bankruptcy estate . . . [the plaintiff] will usually be deemed to have had a motive to conceal those claims." *Id.*

In this case, there is no direct evidence of intent and no other evidence sufficient to infer intent.  First, the Plaintiff's level of knowledge as to her claim for unpaid wages is in dispute.  The parties did dispute the issue of payment for on-call hours in 2011, prior to the Plaintiff's filing of her 2012 bankruptcy petition.  However, the Defendants made it clear to her that they would not pay her wages for on-call hours.  According to the Plaintiff, she was told not to bring up the subject again and she believed that there was nothing she could do to change the Corporation's decision.  Although she was aware of the factual situation, she did not learn of a potential cause of action for wages until she met with counsel to discuss a sexual harassment lawsuit in October of 2012.

The facts of this case are clearly distinguishable from those addressed by this Court in *Calafiore*.  In that case, the plaintiff/debtor discussed his claim arising out of an auto accident

with his bankruptcy counsel and filed his personal injury case later on the same day his debts were discharged.  418 F. Supp. 2d at 797.  Judge Blake of this Court reasoned that the plaintiff in *Calafiore* had both knowledge of, and motive to conceal, certain claims for damages.  *Id.* (holding that there was no motive as to some debts that were exempt from bankruptcy under Maryland statute).  In contrast, the Plaintiff in this case had a less clear-cut cause of action that was not discussed with her bankruptcy attorney.  She did not file this action until almost a year after her discharge in bankruptcy.  Taking the facts in the light most favorable to her as the nonmoving party, she did not learn of her potential rights under federal and state wage laws until she sought legal representation.  The evidence in the record does not show that Skrzecz had sufficient knowledge of the wage-based claims at any time during the bankruptcy proceeding to infer an intent on her part to conceal potential assets from the Bankruptcy Court.  In addition, the dispute regarding pay for on-call time is ongoing.  Accordingly, the large majority of the Plaintiff's claims for unpaid wages arose after her debts were discharged on July 25, 2012.  Thus, taking the facts in the light most favorable to her, the Plaintiff did not have sufficient knowledge of a potential claim to deliberately omit it from her petition.  As to motive, this Court acknowledges that a successful wage lawsuit may have added assets to the bankruptcy estate, but under the totality of the circumstances noted above, there is insufficient basis to infer that she acted intentionally.  *Calafiore*, 418 F. Supp. 2d at 798 (both knowledge and motive must be present to infer intent).  Therefore, the Plaintiff is not judicially estopped from asserting her wage-based claims in this case.

13

## II.     The Plaintiff's Claims

The Defendants argue that even if the Plaintiff is not judicially estopped from asserting her wage-based claims, summary judgment is nevertheless warranted.

### A.  Defendants McMillan and Dorio's Status as "Employers"

The Defendants McMillan and Dorio move for summary judgment as to all claims against them, arguing that they are not the Plaintiff's employers under the Fair Labor Standards Act, the Maryland Wage and Hour Law, and the Maryland Wage Collection and Payment Law.  The FLSA only prohibits an "employer" from failing to pay required wages and from retaliating.  29 U.S.C. §§ 206, 215 & 216.  An employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  *Id.* § 203(d).  As this Court has previously noted, the definition of employer should be "interpreted broadly to achieve Congress's intent to provide a remedy to employees for their employees' wage and hour violations."  *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 890 (D. Md. 2011).  However, courts must respect the corporate form, and an officer of a corporation is not necessarily an employer for FLSA purposes.  *Caseres v. S&R Mgmt. Co.*, No. AW-12-1358, 2012 WL 5250561, at *3 (D. Md. Oct. 24, 2012).  Rather, as recently restated by this Court, whether a person is an employer depends on the "economic reality" of the individual's status in the workplace.  *Gionfriddo*, 769 F. Supp. 2d at 890.

To determine the economic reality of the individual's status as an employer, this Court regularly analyzes the following factors relating to the degree of formal control exercised by the individual in question:  "(1) authority to hire and fire employees; (2) authority to supervise and control work schedules or employment conditions; (3) authority

to determine the rate and method of payment; and (4) maintenance of employment records." *See, e.g.*, *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 413 (D. Md. 2013).  The test is not mechanically applied and no single factor is dispositive; the determination "does not depend on 'isolated factors but rather upon the circumstances of the whole activity.'"  *Gionfriddo*, 769 F. Supp. 2d at 890 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  The "economic reality" test also determines whether a person is an employer pursuant to the Maryland Wage and Hour Law and the Maryland Wage Payment and Collection Law.[7]  *See Newell v. Runnels*, 967 A.2d 729, 770 (Md. 2009); *Khalil v. Subway at Arundel Mills Office Park, Inc.*, No. CCB-09-0158, 2011 WL 231793, at *2 (D. Md. Jan. 24, 2011) (noting that the Maryland Wage and Hour Law is the state equivalent of the Fair Labor Standards Act and defines employer identically); *Campusano v. Lusitano Constr. LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012) (applying economic reality test to MWCPL claim).

In this case, there is a genuine issue of material fact as to whether the individual Defendants are the Plaintiff's employers.  Both McMillan and Dorio were executives of the Corporation during at least some of the time at issue.  The economic reality of their employment relationship to the Plaintiff is in dispute.  The evidence shows that Captain Sperry and Sergeant Welsh hired Skrzecz as a police officer/EMT, not McMillan or Dorio. However, they fired Welsh after the Plaintiff's complaints of sexual harassment.  McMillan assigned Dorio to investigate Skrzecz's discrimination complaints.  Dorio questioned the

---

[7] The MWCPL definition of employer is technically narrower than under the FLSA or MWHL.  *See* Md. Code Ann., Lab. & Empl. § 3-501(b) ("any person who employs an individual in the State or a successor of the person"); *Watkins v. Brown*, 173 F. Supp. 2d 409, 415 (D. Md. 2001) (noting that the MWCPL does not cover an individual who acts indirectly in the interest of another employer). Nevertheless, courts use the economic reality test to determine whether an individual is an employer under the MWCPL.  *See, e.g.*, *Campusano*, 56 A.3d at 308.

Plaintiff as part of that inquiry, leading to Welsh's termination.   During the same time period, McMillan spoke for the Corporation when the Plaintiff complained through counsel that she should receive pay for on-call time.   McMillan determined that the Plaintiff would not receive pay for on-call time.   Therefore, they exercised some measure of control over the conditions of her employment as well as the rate and method of her pay.   Other factors may militate against a finding that McMillan and Dorio were employers.   They are not apparently involved in scheduling or day-to-day management of police officer/EMTs.   Finally, the Plaintiff speculates that Dorio maintains employment records, but provides no evidence that he does.   Accordingly, this Court analyzes the substance of the Plaintiff's claims as to all three Defendants.

### B. Fair Labor Standards Act, Maryland Wage and Hour Law, and Maryland Wage Payment and Collection Law Claims

The Defendants move for summary judgment as to the substance of the Plaintiff's claims for on-call time pay on the basis that such time is not compensable under federal or state law.   The facts of the Plaintiff's working conditions are largely not in dispute.   The parties agree that during on-call time, the Plaintiff is required to stay in or near her home on the Island, cannot drink alcohol, and must be ready to respond to emergency and non-emergency calls.   The parties disagree, however, as to the legal question of whether Skrzecz is entitled to wages for on-call time under these conditions.

To determine if on-call time is compensable under the Fair Labor Standards Act, the critical question is whether "the time is spent predominantly for the employer's benefit or the employee's." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) (instructing that the answer depends on all the circumstances of each case); *Roy v. Cnty. of Lexington, S.C.*, 141

F.3d 533, 544 (4th Cir. 1998) (citing *Armour & Co.*, 323 U.S. at 133).   Employees must be compensated if they are "engaged to wait," but an employer is not required to pay an employee who is merely "waiting to be engaged."   *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944); 29 C.F.R. § 785.14 (quoting *Skidmore*, 323 U.S. at 137).   There is no mechanical test to determine the nature of the on-call time, however, courts examine several factors, including:  the agreement of the parties, the nature and frequency of the services provided in relation to the time spent waiting, where the plaintiff is waiting, whether the employee may carry a beeper or leave home, the employee's ability to switch on-call shifts, and whether the employee actually engaged in personal activities during on-call time.[8]   *See* 29 C.F.R. § 785.14 (quoting *Skidmore*, 323 U.S. at 136-37); *Kelly v. Hines-Rinaldi Funeral Home, Inc.*, 847 F.2d 147, 148 (4th Cir. 1988); *Whitten v. City of Easley*, 62 F. App'x 477, 479 (4th Cir. 2003); *Myers v. Balt. Cnty. Md.*, 50 F. App'x 583, 587 (4th Cir. 2002); *Marroquin v. Canales*, 505 F. Supp. 2d 283, 295 (D. Md. 2007); *see also* United States Dep't of Labor, Wage & Hour Div., Opinion Letters – Fair Labor Standards Act, No. FLSA2008-14NA (Dec. 18, 2008) (noting factors considered by federal courts and collecting cases).

When an employee resides on the employer's premises, there is a presumption that he or she is not working the entire time on the premises.   *Myers*, 50 F. App'x at 587 (citing 29 C.F.R. § 785.23 ("An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises.   Ordinarily, he may engage in normal private pursuits and thus have enough time

---

[8] This issue may be answered as a matter of law, *Kelly v. Hines-Rinaldi Funeral Home, Inc.*, 847 F.2d 147, 148 (4th Cir. 1988), or if the facts are unclear, may be answered at trial, *Marroquin v. Canales*, 505 F. Supp. 2d 283, 295 (D. Md. 2007).

for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own.")).

The evidence in the record shows that the during on-call time, the Plaintiff may stay in her home or is free to travel on the Island.  While on call, the Plaintiff states that she eats, sleeps, watches television, and spends time with her son.  Am. Compl. ¶ 38.  Despite the characterization by the Plaintiff that these activities are similar to those permitted in a minimum security prison, the Fourth Circuit concluded in *Myers* that eating, sleeping, and watching television at night are just the types of personal activities that constitute "uninterrupted personal pursuits."  50 F. App'x at 587 (holding that "Caretakers" who were required to live at a park twenty-four hours per day to respond to infrequent emergencies were not entitled to on-call time pay).  The Plaintiff states that she may not have visitors, such as her boyfriend or grandchildren.  However, she admits that she spends time with her son when on call.  This apparent discrepancy is insufficient to create a genuine issue of material fact.  Additionally, although the Plaintiff may hear several radio calls in one night, she testified that she only has to respond very infrequently.  The required response time varies, depending on whether the call is emergent or not.

Based on that evidence, it is difficult to distinguish this case from the situation in *Kelly v. Hines-Rinaldi Funeral Home, Inc.*, involving a funeral home employee who lived on the premises rent-free, was required to stay on the premises during night hours six days a week, and had to answer telephone calls at any hour and pick up corpses as needed.  847 F.2d 147, 147-48 (4th Cir. 1988).  The plaintiff in the *Kelly* case received only a few phone calls and only had to pick up an average of two corpses per month.  *Id.* at 148.  The Fourth Circuit

held that he was not entitled to on-call pay. *Id.* Likewise, in this case, the Plaintiff receives very few calls on her beeper that require her response.

Emergency workers who receive infrequent calls may not be entitled to pay for the time they wait for such calls. *Whitten v. City of Easley*, 62 F. App'x 477, 479 (4th Cir. 2003). In *Whitten v. City of Easley*, firefighters who worked twenty-four hour shifts, then spent forty-eight hours on call were not entitled to pay for on-call time. *Id.* The firefighters carried beepers and were only "encouraged" and not required to respond, on average, to four out of six calls received per month that came in while they were on call. *Id.* Meanwhile, they were free to travel out of state, drink alcohol, and otherwise pursue personal interests. *Id.* The Fourth Circuit contrasted those plaintiffs to firefighters in a case from the Tenth Circuit who were "engaged to wait" when they were called back to duty an average of four to five times *per day* of time on call. *Id.* (citing *Renfro v. City of Emporia*, 948 F.2d 1529, 1531 (10th Cir. 1991)). While in this case, the Plaintiff's circumstances fall somewhere between these two examples, it is important to note that "the test is not whether the employee has substantially the same flexibility or freedom [she] would have if not on call." *Whitten v. City of Easley*, 62 F. App'x at 480 (quoting *Ingram v. Cnty. of Bucks*, 144 F.3d 265, 269 (3d Cir. 1998)). Rather, the relevant inquiry is "whether they may actually engage in personal activities during on call shifts." *Id.* (quoting *Berry v. Cnty. of Sonoma*, 30 F.3d 1174, 1184-85 (9th Cir. 1994)); *Myers*, 50 F. App'x at 587 (where employees lived on employer's premises, on-call time spent on personal pursuits was not interrupted so frequently as to be time spent primarily for employer's benefit).

Certain other factors may weigh in favor of the Plaintiff's argument, but do not raise a genuine dispute as to whether the Plaintiff's on-call time is compensable.  The fact that the Plaintiff cannot leave the Island is somewhat restrictive, but based on the case law on this issue, is clearly less harsh than, for example, the funeral parlor employee in *Kelly* who worked in the age of land lines and could not leave his apartment at all except to transport corpses.  In addition, although the agreement between the parties is disputed by the Plaintiff, that dispute is related to the amount of on-call time the Plaintiff expected to work, not the conditions of time on call.  Additionally, the Plaintiff argues that she was not free to trade her on-call time with other police office/EMTs, which is a relevant factor as stated in *Whitten v. City of Easley*, 62 F. App'x at 479.  However, there is evidence that the Plaintiff did have some ability to trade on-call responsibilities with others.  *See* Pl.'s Opp. 18 (stating that it was difficult to trade because there was only one other resident police officer/EMT).  No single factor is dispositive, and any dispute between the parties on the ability or inability to trade on-call responsibility is not material.  Thus, when viewed within the overall conditions of time on call, these factors are clearly outweighed by those militating against compensability.  Based on all the circumstances of this case, the Plaintiff was not so restricted that she cannot use her on-call time for personal activities.  Therefore, the time the Plaintiff spends on call is not compensable under the FLSA.

The result is the same as to the Plaintiff's Maryland law claims.  This Court has noted that both the FLSA and Maryland law distinguish between time "engaged to be waiting," which is compensable, and "waiting to be engaged," which is not.  *Marroquin*, 505 F. Supp. 2d at 295.  However, this Court also noted that Maryland law is undeveloped in this area.  *Id.*

Several years after *Marroquin*, it appears that there has been scant further development in Maryland law as to pay for time on call. *See* Defs.' Mem. 25 (noting that the MWHL and MWCPL are silent as to on-call time and that no Maryland court has analyzed whether an employee who is on call is "on duty"). Where a Maryland appellate court has not addressed an issue, to the extent that a state statute is analogous to a federal statute, the decisions of federal courts are highly persuasive authority.[9]  *See, e.g.*, *Klupt v. Krongard*, 728 A.2d 727, 735 (Md. Ct. Spec. App. 1999) ("When, as here, there is little Maryland precedent, we look to cases interpreting analogous federal rules."). Therefore, this Court applies the standard under the FLSA, and the reasoning of the cases noted above, to claims made pursuant to the MWHL and MWPCL. *Marroquin*, 505 F. Supp. 2d at 295. Having concluded that based on the largely undisputed evidence, Skrzecz is not entitled to pay for time on call under the FLSA, judgment as a matter of law is also warranted on the Maryland law claims. The conditions under which the Plaintiff is required to be on call do not preclude her from using that time for primarily personal pursuits. Therefore, she is not entitled to pay for that time under the Maryland Wage and Hour Law or the Maryland Wage Payment and Collection

---

[9] Maryland courts have analyzed the compensability of on-call time in other circumstances. *See Dep't of Pub. Safety & Corr. Servs. v. Palmer*, 886 A.2d 554, 454-55 (Md. 2005); *Hess v. Dep't of Juvenile Servs.*, 962 A.2d 1037, 1044 (Md. Ct. Spec. App. 2008) (citing United States Dep't of Labor, Wage & Hour Div., Opinion Letters – Fair Labor Standards Act, No. FLSA2008-14NA (Dec. 18, 2008)). Those cases involved a provision of the Code of Maryland Regulations, COMAR 17.04.11.02(B)(1)(g), related to time on call, that grants "greater" benefits than the FLSA. However, COMAR 17.04.11.02(B)(1)(g) only applies to State employees whose pay is determined by the Department of Budget and Management pursuant to Md. Code Ann., State Pers. & Pens. § 8-302. Plaintiff is not such an employee and her claims are not based on this COMAR provision. Additionally, the Defendants note that the Maryland Department of Labor, in guidance on what constitutes "work," notes factors that are similar to those identified by the Federal Department of Labor. *See* Md. Dep't of Labor, Licensing & Regulation, *Md. Guide to Wage & Payment Empl. Standards*, What is Work? (2014). Therefore, there is no basis to conclude that the definition of on-call time under the MWHL and the MWPCL is any broader than on-call time under the FLSA.

Law.  Accordingly, the Defendants' Motion for Summary Judgment will be granted as to the Plaintiff's claims for unpaid wages in Counts I, II & III.[10]

## C. Retaliation

Finally, the Defendants move for judgment as a matter of law in their favor as to the Plaintiff's claim that they violated the anti-retaliation provision of the Fair Labor Standards Act.  29 U.S.C. § 215(a)(3) ("It shall be unlawful for any person—to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . .").  To make a prima facie case of retaliation under the FLSA, a plaintiff must show that (1) she engaged in protected activity under the FLSA; (2) she suffered an adverse employment action subsequent to, or contemporaneous with, the protected activity; and (3) there is a causal connection between the plaintiff's protected activity and the employer's adverse employment action.  *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008).  As to the first element of a prima facie case of FLSA retaliation, based on the remedial purpose of the statute, informal intra-company complaints are protected activity.  *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 437-38 (4th Cir. 2012) (adopting the majority rule that informal internal complaints are within the meaning of "filed any complaint" under the FLSA).

With respect to the second element of the prima facie case, the Supreme Court of the United States has established that an adverse employment action is one that a "reasonable employee" would have found "materially adverse, which in this context means it well might

---

[10] As noted, the issues regarding the Plaintiff's additional fraud-based claims have not been briefed, and in this Memorandum Opinion this Court does not address those additional claims raised in the Amended Complaint.

have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Darveau*, 515 F.3d at 342 (applying the standard under Title VII of the Civil Rights Act of 1964 to FLSA claim for unpaid wages (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57)).   In *Burlington Northern & Santa Fe Railway Co.*, a Title VII case, the Supreme Court noted that the purpose of an anti-retaliation provision is to give employees "unfettered access" to remedial statutes "by prohibiting employer actions that are likely to deter victims of discrimination from complaining."   548 U.S. at 68 (citations and internal quotation marks omitted).   The Court applied an objective standard because "the significance of any given act of retaliation will often depend upon the particular circumstances."   *Id.* at 69 (noting, for example, that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.").   "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position," the Court articulated a standard that "will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."   *Id.* at 69-70.   Under that standard, adverse employment actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."   *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) and citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

Third, establishing a causal connection normally requires "very little evidence"; the mere temporal proximity of protected activity to adverse employment action is sufficient to carry a plaintiff's burden to make a prima facie case of causality.[11]  *Jackson v. Mayor of Balt. City*, No. JFM-08-3103, 2009 WL 2060073, at *7 (D. Md. July 14, 2009) (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118-19 (2002) (addressing acts occurring outside statute of limitations as they relate to hostile work environment claims).

In this case, the Plaintiff made informal intra-company complaints to Sergeant Welsh and Chief Sperry.  This constitutes protected activity within the meaning of "any complaint" under the FLSA.  Immediately after the Plaintiff complained to Chief Sperry, he allegedly threatened her with the adverse employment action of termination if she continued to bring it up.  As a result, the Plaintiff kept quiet, that is, she was dissuaded from supporting her claim.  Thus, based on the immediate temporal proximity of the Defendants' response, there is sufficient to infer a causal connection between Skrzecz's informal complaints about pay for on-call hours and the adverse employment action.

Only after seeking representation to help combat harassment by Sergeant Welsh did the Plaintiff reassert her wage claim.  When the Defendants again refused to pay for on-call

---

[11] The effect, if any, of the Supreme Court's recent decision in *University of Texas Southwestern Medical Center v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2533 (2013), which established a "but-for" causation standard for retaliation claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, has not been addressed as to FLSA cases.  *See Avila v. Los Angeles Police Dep't*, ___ F.3d ___, 2014 WL 3361123, at *3 n.3 (9th Cir. July 10, 2014) (declining to address whether a "but-for" jury instruction is required in FLSA retaliation cases).  However, as noted by this Court, establishing "but-for" causation is the ultimate burden that a plaintiff must prove at trial, while at the summary judgment stage, a plaintiff "faces a less onerous burden of making a prima facie case of causality." *Ford v. Berry Plastics Corp.*, No. RDB-12-0977, 2013 WL 5442355, at *10 n.8 (D. Md. Sept. 27, 2013).  Therefore, this Court need not reach the issue of whether *Nassar* applies to the FLSA.

time, the Plaintiff engaged in protected activity by making a complaining, through counsel, about unpaid wages in late 2012, and by filing this lawsuit in 2013.  Crediting the nonmoving party's version of events, as this Court must, Chief Sperry told her to tell her lawyer to "back off" because "people were angry" that she complained about her wages and got Sergeant Welsh fired.  Soon after Skrzecz's attorney became involved in the dispute, Chief Sperry began changing the Plaintiff's schedule on short notice.  He then changed the rules through a Chief's memo.  Pl.'s Opp. Ex. 5.  The Plaintiff asserts that these new rules were tailored to fit the Defendants' theory of this case.  Chief Sperry then disciplined her based on these newly-created rules.  Chief Sperry's scheduling and disciplinary decisions must be viewed in light of his alleged comments regarding his disdain for the Plaintiff engaging in protected activity.    In their totality, these facts could convince a reasonable finder of fact that a reasonable worker would find the Defendants' actions materially adverse so as to dissuade her from bringing a claim.  As to causality, Chief Sperry's actions followed close on the heels of the filing of the Plaintiff's lawsuit.  Moreover, the alleged comments made by Chief Sperry about this lawsuit may be evidence that his actions were motivated by the Plaintiff's engaging in FLSA-protected activity.  Thus, the causal connection prong is also satisfied as to actions taken by the Defendants after the filing of the FLSA suit.  In sum, there is a genuine issue of material fact as to whether the Defendants retaliated against the Plaintiff both for raising wage-related internal complaints and for filing this lawsuit.  Accordingly, the Defendants' Motion will be denied as to the FLSA retaliation claim in Count IV.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion (ECF No. 24) is GRANTED IN PART and DENIED IN PART.

A separate Order follows.


Dated:  July 11, 2014                              _____/s/_____
                                                                    Richard D. Bennett
                                                                    United States District Judge